*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HANSEL, Minors.

UNPUBLISHED
March 12, 2019

Nos. 344657; 344659
St. Clair Circuit Court
Family Division
LC No. 17-000181-NA

Before: O'BRIEN, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

In Docket No. 344657, respondent-father appeals as of right an order terminating his parental rights to two minor children, EAH and DWH, under MCL 712A.19b(3)(c)(*i*) (failure to rectify the conditions leading to adjudication), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm to the children if returned to the parent). In Docket No. 344659, respondent-mother appeals as of right the same order, in which the court terminated her parental rights to EAH and DWH under the same grounds. We affirm.

The children were removed from respondents' home on May 1, 2017. On May 2, 2017, petitioner filed a temporary petition alleging that (1) EAH had "very dark bruising" on both buttocks, including bruising in the shape of a handprint; (2) respondent-father admitted to causing the bruising by way of spanking; (3) respondent-father admitted that he should have sought medical care for EAH but had not; (4) respondent-mother admitted to observing respondent-father spanking the child but failing to protect her; (5) respondents "medically neglected" both children, neither of whom was potty-trained, despite being the ages of 4½ and 7; (6) respondents' home was "deplorable" and dirty, with an odor of urine; (7) full and empty alcohol bottles were within reach of the children in the home; and (8) respondent-father had other children that were removed from his care due to concerns of physical neglect, he was provided foster care and child-protective services such as the Families First parenting program as part of that proceeding, but he did not benefit from those services and ultimately had his rights to the other children terminated.

On May 25, 2017, both respondents admitted to the allegations in the petition, and the trial court assumed jurisdiction over the children. The children were found to have special needs. EAH had developmental delays, cognitive impairments, and was eventually diagnosed

with autism and reactive-attachment disorder. DWH had "global developmental delay," used very little speech, and was considered oppositional defiant. Neither child knew how to eat with utensils or how to get dressed without assistance. The trial court ordered respondents to, among other things, obtain and maintain suitable housing for a minimum of three consecutive months, refrain from alcohol and drug use, participate in and show benefit from parenting education, participate in and show benefit from an in-home program to address the home environment and their parenting skills, and complete a psychological assessment and follow the resultant recommendations.

Respondents participated in numerous services, including individual counseling at Catholic Charities and five parenting programs, with respondent-mother, in particular, showing an eagerness to cooperate with petitioner and with the recommended services. Caseworkers, however, testified that despite respondents' involvement in the various services, respondents failed to improve their parenting skills to a point where they could safely parent the children. Eventually, after multiple review hearings and a permanency-planning hearing, petitioner filed a supplemental petition for termination of respondents' parental rights. Following a two-day termination hearing in May 2018, the referee issued an order of termination, and the circuit court adopted the referee's findings of fact and conclusions of law. Respondents now appeal as of right.

Respondents argue that the lower court erred by finding statutory grounds for termination of their parental rights. We disagree.

To terminate parental rights, a trial court must initially find, by clear and convincing evidence, a statutory ground for termination, MCL 712A.19b(3), and this Court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is clearly erroneous if, even though some evidence supports it, the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *Id*.

MCL 712A.19b states, in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[1]

---

[1] Effective June 12, 2018, MCL 712A.19b(3)(g) was amended by 2018 PA 58 to read that a trial court may terminate a parent's parental rights if:

The trial court did not clearly err by finding that the ground for termination in subsection (g) was established by clear and convincing evidence.

The evidence demonstrated that both respondents failed to provide proper care or custody to EAH and DWH. Respondent-father physically injured EAH and served time in jail for child abuse as a result, and respondent-mother failed to protect EAH from this abuse. The respondents' treatment of EAH is probative of the way that they would care for DWH. See *In re Jackson*, 199 Mich App 22, 26; 501 NW2d 182 (1993) (explaining the doctrine of anticipatory neglect). In addition, the children's medical needs were not being properly addressed by respondents. After initiation of the case, respondent-father was "standoffish" about services, fell asleep during visitations, failed to engage with EAH, forgot to bring items for visitations, and failed to show improvement in parenting skills such that he would be able to parent the two children, both of whom had special needs. While respondent-father testified that he benefitted from services and was merely closing his eyes, not falling asleep, during visits with the children, and while respondent-father's neighbor and his adult stepdaughter spoke somewhat favorably of respondents' parenting, this Court "defer[s] to the special ability of the trial court to judge the credibility of witnesses." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014). In addition, while there was considerable evidence, including photographic evidence, that the deplorable condition of the home had been rectified, this was only one aspect of proper care and custody.

Respondent-mother's psychological evaluation showed "extreme" results related to her poor parenting abilities. A caseworker reported that respondent-mother often became "overwhelmed and frustrated" with the children and that her parenting skills were "lacking." Respondent-mother listened to feedback about parenting and was receptive and attentive, but she was not good at implementing suggestions. During visitations, she would express what a caseworker characterized as "juvenile reaction[s]." For example, respondent-mother argued with EAH about a timeout during a visit on February 22, 2018, and during a visit on March 13, 2018, respondent-mother "kept asking the children who their mother was" and cried in front of EAH when EAH replied with the name of her foster parent. Another caseworker reported that on September 12, 2017, respondents spun DWH in a chair until he vomited despite the worker's suggestion that it was not a good idea; the caseworker stated that respondents "did not seem to understand that their actions of spinning the child while he didn't feel well were likely the cause of this vomiting." Respondent-mother also struggled to remember what items to bring for visitations, and caseworkers testified that both respondents failed to improve their parenting abilities such that they could properly care for the special needs of the children. In addition, respondent-mother reported during her psychiatric evaluation, "sometimes I think I should just give up my children for adoption so that I don't have to deal with Child Protective Services."

---

The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Perhaps the most probative evidence of the lack of proper care and custody is how much the children improved while in foster care, with someone properly addressing their needs. KW, the children's foster parent since August 2017, testified that upon EAH's arrival in KW's home, EAH had "feral" behaviors such as peeing in the sink and spitting on the floor, and DWH was reserved, with few social skills. Both children had issues with aggressive behavior including hitting and biting. KW explained that DWH had "gained two years of developmental gains" since he had been in KW's home. She also described EAH's progress as "dramatic" and stated that she was a "totally different child" from when she came into her home. EAH is now able to read, and do addition, subtraction, and basic multiplication. KW, as well as a mental-health clinician, opined that the children need consistent structure to continue progressing. EAH in particular needs an "enormous" amount of advocacy and "a lot of depth of understanding" because of her special needs. Both children resisted visitations with respondents and regressed after spending time with respondents.

In addition to showing a lack of proper care and custody, the evidence showed no reasonable expectation that respondents would be able to provide proper care and custody within a reasonable time considering the children's ages. Indeed, they did not show any benefit from the services offered during this case. Respondents were referred to five different parenting programs and completed all but one, Parenting Time Supportive Services, which simply ended when the visits were brought back to the Department of Health and Human Services' (DHHS) office due to concerns with what was happening during visits taking place at McDonald's. Even though respondents completed these programs, they continued to be easily frustrated with the children's behaviors and overwhelmed at visits. A caseworker reported that respondents had a few conversations about being unable to complete all of their requirements, including employment, parenting classes, parenting time visits, and counseling at the same time.[2] According to the caseworker, respondents understood that they were required to complete the court-ordered services, but they struggled to understand why the services were necessary and what benefit they had.[3] Respondents continued to "minimize the concerns that brought the children into care." They reported during their psychological evaluations and to the pre-sentencing investigator that the children were removed because respondent-father spanked EAH, thus disregarding the additional reasons for removal. Moreover, respondents previously received services through Community Mental Health (CMH) from 2012 to 2015, not in the context of the

---

[2] These comments were especially concerning given the number of therapy programs that the children required to continue the progress they made since their removal. The caseworker testified at a permanency-planning hearing that the children have four to five appointments for their own therapy and services per week and that there was serious concern that the parents would be unable to keep up with the necessary appointments as they were overwhelmed with their own services.

[3] At a family team meeting, respondent-father asked workers how long he would need to continue working after the children came home. A caseworker testified at a permanency-planning hearing that neither respondent seemed to understand that the need for a steady income was to ensure that the children's needs were met and was not just an arbitrary recommendation by the DHHS.

current proceedings, and showed difficulties in benefitting from those services as well. Respondents received home-based services, infant mental health and family training, and intensive home-based and parenting training. The case notes from CMH revealed that during that period, too, the parents had been frustrated and unable to retain the lessons taught. Further, respondent-father had his parental rights to other children terminated in 2001 after receiving services.[4] Thus, the trial court did not clearly err by finding that respondents simply have not shown an ability to benefit from services[5] such that they will be able to parent EAH and DWH properly within a reasonable time, considering the children's ages. MCL 712A.19b(3)(g).

On appeal, respondent-mother appears to argue that because certain specialized services are now being provided for the children, respondents could *continue* to provide them, and therefore, there *was* a reasonable expectation that respondent-mother would be able to provide proper care and custody within a reasonable time. This argument is not persuasive. It was not unreasonable for the lower court to conclude that because respondent-mother did not effectively implement parenting skills she had *already* been taught, she would similarly fail to implement needed skills and tasks into the future. As noted, testimony established that respondent-mother did not benefit from the services offered during the case, and she had difficulty benefitting from other services received in recent years.

Respondent-mother also argues, in the context of discussing the statutory bases for termination, that petitioner did not provide adequate family-reunification efforts for her because she never had the opportunity to demonstrate her allegedly newly-learned parenting skills in a home environment.[6] This argument, too, is not persuasive. Respondent-mother received a plethora of services in this case. Accordingly, she should have been able to demonstrate some parenting-skills improvements even during visitations, and it was reasonable for petitioner to want to see demonstrated improvement before placing the children back into the family home.

We conclude that the trial court did not clearly err by finding that the ground for termination in subsection (g) was established by clear and convincing evidence, and we further conclude that the lower court did not clearly err by finding clear and convincing evidence of the basis for termination in subsection (j), which allows for termination if "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j). Respondent-father's physical abuse towards EAH was so severe that he served jail time for it, and he failed to

---

[4] Respondent-father denied receiving services in the prior termination case but a caseworker testified that he did.

[5] We note that the mere participation in a service plan is not the crucial point when it comes to services; the issue is whether a parent has sufficiently *benefitted* from the services. See, e.g., *In re White*, 303 Mich App at 713.

[6] "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.).

demonstrate an improvement in his parenting skills to suggest that such abuse would not happen in the future. And how respondent-father treated one child is probative of how he would treat another. *In re Jackson*, 199 Mich App at 26. In addition, in light of both respondents' lack of improvement in parenting skills, the dramatic improvements the children made in foster care, and the regression they demonstrated after visitations, it was likely that the children, if returned, would regress from the tremendous progress they had made in foster care. There was a reasonable likelihood of harm—at the very least, emotional harm—if the children were to be returned to the family home. See *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011) (indicating that subsection (j) encompasses both physical *and* emotional harm).[7]

Respondents also argue that the lower court erred by concluding that termination of their parental rights was in the children's best interests. We disagree.

"If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re Brown/Kindle/Muhammad Minors*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5).

> To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citations omitted).]

We review for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012).

The referee stated, "In this case there is a very decided advantage for both of these children to be in the foster home over the parents['] home." This conclusion is amply supported by the evidence. A caseworker testified that there was "very little" bonding between respondents and the children. The children resisted visitations with respondents and EAH reported that she did not want to go to visitations at all. Both respondents acted inappropriately during visitations. For example, the caseworker noted during a visit on June 14, 2017, that when EAH was attempting to negotiate the length of her timeout, she used her fingers to suggest a different number of minutes and respondent father became very upset that she appeared to use her middle

---

[7] Given our conclusions regarding subsections (g) and (j), we decline to address subsection (c)(*i*). See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011) (explaining that only a single statutory ground needs to be established to support termination of parental rights under MCL 712A.19b(3).

finger, despite the worker suggesting that EAH was just counting and did not understand the adult meaning of the middle finger. He insisted that EAH learned it from her foster home and confronted the foster parent about it after the visit. In addition, the respondents did not have realistic expectations for the children's behavior and often overreacted to minor misbehaviors. For instance, at a visit on June 20, 2017, when respondents attempted to play a memory game with the children—who do not have the cognitive ability to follow the rules of such a game— respondent-father got frustrated for EAH not taking turns and she received a time-out after respondent-father argued with her about whether she was cheating. Both respondents were also observed using "excessive force" when placing the children in timeout. On July 18, 2017, respondent-mother became frustrated when DWH was rocking in a chair and bumping into her in attempt to gain attention, so she "grabbed the chair and yanked it around to the other side of the room while [DWH] was still sitting in it." DWH was upset and screaming while respondent-mother yelled at him and told him she was going to ignore him the rest of the visit.

Although respondents participated in multiple parenting programs and regularly attended individual counseling, testimony established that neither respondent benefitted sufficiently from services in order to parent effectively. Respondents' behavior at visitations did not improve over time. Caseworkers reported that the respondents continued to become easily frustrated with the children's behaviors and overwhelmed. Respondent-father was "disengaged" from EAH, in particular, and he fell asleep on two separate occasions even though the visits were only for two hours once per week. During a visit on February 22, 2018, EAH was screaming and spitting on respondent-mother's face and respondent-mother was "laughing and continued to argue with [EAH]" while she was sitting in the chair about why she was in timeout. Respondent-mother ultimately had to be redirected by the caseworker at the visit. At the end of visits, EAH would refuse to give hugs and neither child was observed to be overly emotional about leaving as both appeared to have "minimal attachment" to respondents. Further, after visitations, despite the children's progress in the foster home and in their various therapy programs, the children's behavior would regress and escalate to the point of attacking one another in the back seat of the car, which led to KW having to bring an alternate caregiver and an additional vehicle to transport the children back home separately to avoid physical altercation. Additionally, according to KW, EAH previously suffered from night terrors that involved her screaming and yelling at people who were not present. Those night terrors decreased as the visits with respondents became less frequent, and they completely stopped once the visits ended.

The most important factor for the best-interests analysis in this case is how much the children had improved since entering foster care. Given the children's dramatic progress, their special needs related to development, their need for structure and consistency, and respondents' inability to parent properly, the lower court did not clearly err by concluding that termination of respondents' parental rights was in the children's best interests. Being in foster care provided the children with the support that respondents could not provide.

We affirm in both appeals.

/s/ Colleen A. O'Brien
/s/ Kathleen Jansen
/s/ Amy Ronayne Krause